The first case we'll hear this morning is United States v. Howell. Mr. Sheldon, we'll hear from you. May it please the Court. I'm John Sheldon for Mr. Howell. I'd like to reserve five minutes for rebuttal, please. We're asking this Court to reverse the District Court's decision denying Mr. Howell's motion to suppress. Let me just start by talking about Detective Beha. Detective Beha had an informant, and the informant told him that there was a named target, a specific target, who was going to go to the Aloft Hotel and meet with other drug dealers to distribute those particular drugs. Detective Beha went to the hotel, and the informant's tip was wrong. He couldn't find the target, and this target, again, was a named target. And because he couldn't find the named target, the informant's tip wasn't reliable, and there was no reason why any of the other information should be relevant to anybody else. That is, the target was supposed to be dealing his drugs to other drug dealers, but he's not there, so there's no other people to deal his drugs to. I guess I certainly agree that the fact that the informant had the name wrong is a problem and not ideal. I guess I don't know why that means that nothing the informant says is reliable at all. Why is that? So first, the informant was wrong about the most important thing. No, I agree. That's not a small thing, but why does it make everything? And it wasn't the name wrong. Nobody argued. Detective Beha testified three times that he was looking for a specific person. There wasn't a confusion of the name. I don't want to leave here saying, well, maybe he got the name wrong. He didn't get the name wrong. The informant specifically, Detective Beha said three times, had a particular target in mind, and in argument, the government said it wasn't Hal. There's no doubt about that. I think you make a very good point about the informant. The coincidence is uncanny in terms of the vehicle, the license plates, the passenger, and the meeting at the location at the particular motel. I was trying to figure out how the informant got the driver wrong. And my thinking is maybe we don't know the facts, but maybe he didn't get it wrong. Maybe he did drive up at 2 in the morning. Maybe they did have their meeting at the hotel. And maybe Hal then drove him to the airport and let him go back to Atlanta and kept the car. And he's returning now. He goes back to his room, picks up a bag. That's hypothetical, totally speculative. But my point is it isn't categorically wrong. What is right is there is something there, but even if you set that aside, you have this fellow Hal that all of a sudden appears as a result of that thought about meeting. There was something took place because that bag was in the room, and there was drugs in the bag later. We knew that. So the question is there probably was something going on in that room earlier, in Hal's room. They were put on to Hal, from your point of view, they were put on to Hal by coincidence. Yes, that's right. It wasn't uncanny. So now the question is they're now facing Hal. And the question now is what do they know about Hal in the entire circumstance? That's right. That's really what I think your best case is to try to narrow it to that, exclude the warrant business because of the sequencing, and focus on what they knew about Hal at that point and at that location at that time. That's right, Judge. And there are two things that I would say about that. I wouldn't say it's – I knew quite a bit about Hal, too. He knew a lot about Hal. And what he knew about Hal I would say dispelled reasonable suspicion. The main thing he knew about Hal is he investigated him three to four years ago, and the investigation led to nothing. I always look at this. No, no, that's not fair. They knew he was a distributor. They did not bring charges against him. They didn't have enough against him. He had also been convicted before, right? Judge, I would say that's not fair. Let me retort. That is not fair. Ten years prior, he had one conviction for possession. Yeah. And then they investigate him, and he's been told he's the main distributor in the investigation. They knew him as a drug dealer. Your Honor, when there is a fact that equally could apply to you or I, I would say that dispels reasonable suspicion. If I am investigated and no charges or arrests, it is extremely unfair and unreasonable, I would say, under the exclusionary rule, to say that counters on the side of reasonable suspicion because I was investigated. Virtually every case we get, and we get hundreds of them, we have these big conspiracies, and a lot of them are in eastern Virginia. I mean, I'm talking about huge ones, a lot of drug distribution. There are always people that they can't grab who haven't been pulled in, yet who are told were part of things, delivery people, people who receive things, they don't pick up everybody. They pick up who they think they have enough evidence against. They did not have enough evidence apparently against Howell, but they knew of Howell. It's like they know the people on the street, guys carrying a gun, they know pretty much this guy always carries a gun. They can't arrest him until they have better evidence. But I don't think it's fair to say, and there's nothing to suggest, the officer's impression about Howell was wrong. They knew of him as a drug dealer, and they knew of the loft as a place where drug dealing took place. And it seems to me that starts getting the officers pretty far along the road, doesn't it? I don't think so, Your Honor. I think it's extremely unfair to have an investigation that was over three years old, probably four. Of course, the detective's testimony is vague on a number of points, I think intentionally. That doesn't lead to anything. How unfair to the ordinary citizen to be investigated, never arrested, never charged, and then that weighs against him for reasonable suspicion. There is no information he's had except for a ten-year-old possession conviction and this investigation, which ended in nothing. And now forever, Mr. Howell is followed around by close to reasonable suspicion because an investigation led to nothing. I would say these facts are not uncanny. Your Honor, when driving down here and thinking about these facts, I thought these facts apply to me when I visit my sister in Boston. Almost all of these facts. You're a lawyer, and you go to the loft hotel. Yes, I do. And there's no suspicion that you – there was a proposed meeting through a reliable informant at that hotel. And that proposed meeting of several drug dealers was told about. We don't know whether that occurred, but Howell is at that motel at that time. And they know Howell's a drug dealer. Now, you can discount the informant, but they've been using him for, what, five years? Well, Your Honor, to say Mr. Howell's a drug dealer when his conviction is ten years old and a three-and-a-half-year investigation leads to nothing, I think it's very unfair to say Mr. Howell's a drug dealer. Well, it's incredibly bad luck, isn't it, that a person who's known to the police to have had some drug problems in the past shows up and meets every single – checks every single box that the informant said except the name. Your Honor, I think you're making the same mistake the district court did. It is overwhelmingly clear that it was a coincidence. It is overwhelmingly clear that the informant, when describing the target, had a specific person in mind. And 100% of the evidence says this was a named person. They didn't name him for obvious reasons at the evidentiary hearing. It's a named person. The detective behind never suggested that it may have been Howell that was being described. The government never suggested. The government literally said during argument, J.A. 140-141, the government said it was not Howell. It was a coincidence. And what I was trying to say to Judge Niemeyer is when I go to Boston, I stay at a hotel. I rent a car. It's out-of-state plates. Sometimes it's black. How uncanny is it? Not very. And when facts in a case, all the facts, the rental car, the being with a woman, those apply to almost everybody at a hotel, the one-night or two-night stay. What about the meeting of drug dealers that was going to take place at that hotel? Not confirmed. No, that's an informant-related. That's right. We have to assume that there was somebody else other than the identified person in the vehicle that was going to be at that meeting because it used it in the plural, a meeting of drug dealers. That's right. This court has said for a tip to be relied on, it has to be reliable. It has to be confirmed in some way. The extent that Detective Beha tried to confirm the tip, it was not confirmed. That is, the target wasn't there. Of course, it's possible that the target was there and left. However, to the extent he tried to confirm it, he couldn't confirm it, but he found Howell's name. It is a catch-22 to say he found a drug dealer. In fact, everything we know about Mr. Howell weighs against reasonable suspicion, including this very important fact that Mr. Howell wrote his own name in the guest book. He signed it under his own name. Remember the informant said, or the Detective Beha testified, that he was very aware that drug dealers don't use their own name when they rent cars or they log in at a hotel, and Howell did. The few facts that match. Does the record show who rented the car? No, there's nothing about who rented the car. And what I say in my brief is, look, when you drive a car, I'm often driving my wife's car or somebody else's car. The license plate running the registration doesn't tell you who's driving the car. I understand, but the rental agreement would show who signed off on it. That's right, and there's no evidence about that. I'll save the remainder of my time. Okay. Thank you very much. Thank you, Mr. Sheldon. Ms. Cheney?  Good morning, Your Honors, and may it please the Court. My name is Assistant United States Attorney Amanda Cheney. This Court should affirm the denial of the defendant's motion to suppress for two primary reasons. The first is that the totality of circumstances surrounding this traffic stop do establish reasonable suspicion of narcotics trafficking. The other is the existence of the outstanding warrant for the defendant's arrest, which independently provides sufficient basis for the traffic stop. Can I flip that around? Do you agree that we could uphold the search without reaching the arrest warrant issue? Yes, Your Honor. I guess I will confess some trepidation about the arrest warrant issue. So you think that we could just ignore the arrest warrant entirely and uphold without relying on that? I think it's an independently sufficient basis. So you think both of them are independently sufficient basis? Yes, Your Honor. The warrant is sufficient and the non-warrant stuff is sufficient? Yes, Your Honor. Because this is a case where the totality of circumstances… The sequencing, I think Judge Hyten's question points to a slippery slope because it seems to me the sequencing of the information about the warrant gets you into trouble as you go along. I mean, the traffic stop was not justified by a traffic violation. The traffic stop was justified by suspicion of drug trafficking. And so as soon as the police officer and the detectives learn that this was non-extraditable, it seems to me they should let him go if you rely just on the warrant. In other words, all of a sudden they check the warrant out and even before the dog sniff, they learn that it's non-extraditable. At that point they say, we're sorry, the warrant we stopped you on is non-extraditable and you're free to go on your way. Isn't that what would have to happen? Your Honor, the warrant itself is sufficient basis for the traffic stop. It is. But then they learn shortly after the traffic stop and before any other evidence of drug sniffing or anything else, they learn that the warrant is not a justification. Right? No, Your Honor. I would point, Your Honor, to the joint appendix on page… Just answer my question. Didn't they learn that it was non-extraditable? No, Your Honor. After the dog alerted to the vehicle, they learned that… That was a confirmation, wasn't it? Didn't they first learn… They first knew, Your Honor, that there was an outstanding warrant. They did not investigate further until the stop occurred because at that point there was either contact… So you're suggesting the record says that they did not learn that the warrant was non-extraditable until after the dog alerted? Correct, Your Honor. And that is at joint appendix page 114. I had thought that they learned right before. No, Your Honor. In the morning, so the… Didn't the police officer run it on his own dispatch system? The officer that stopped Mr. Howell did run it on his dispatch system after he was stopped. And what did he learn? He learned that it wasn't extraditable. The detectives in the morning that arrived in the morning around 7 o'clock, they were the ones who initially found the arrest warrant themselves. I understand, but I stick with my sequence. The police officer stops it. He runs the warrant through his system, right? And he learns it's non-extraditable, right? Only after the stop, Your Honor. Right, after the stop he learns it's non-extraditable. Was that before or after the dog showed up? After. At approximately 1221 to 1222, dispatcher responds to Officer Byrd that the warrant check resulted in the warrant not being extraditable. The canine alerts at 1216 to 1217 p.m. That's at joint appendix… So he learned no information before that? That officer, no. The detective knew that there was an outstanding warrant and that was at approximately 10 o'clock. That was an NCIC check. Well, I understand that. I understand the fact that there was a policy, not until you get into contact. Well, can I ask you about that policy? Where in the record is that policy that says you can't confirm an NCIC check? The record, I don't have these… I wasn't able to find anywhere in the record where there's a policy, supposedly, attached. I don't have the joint appendix page. It was attached. It was an exhibit at the motion to suppress hearing. The policy itself, also the screenshot of the active arrest warrant from Detective Beja, that's at joint appendix page 45. It's probably somewhere near. I just don't have the exact citation. To take you back to the reasonable suspicion issue, which we could just decide this case based on, what do you say to your friend on the other side's response? I mean, you talked about the name being wrong, but what about the fact that the informant said the car would be from a northern state, and last I checked, Georgia is not a northern state. That's correct, Your Honor, and I want to get to first the name itself because we're talking here about the TIP and the reliability of the TIP. When my colleague says that because the name given was not the name of the defendant, therefore, the analysis should stop, and this TIP is not reliable, it's not completely fair. It doesn't look at all of the information that we have here. First, the government's not conceding that the informant necessarily got the target's identity wrong, perhaps the name but not the identity. There's nothing in the record that shows that this target, because he wasn't in the hotel's registry, was not at that hotel that day, and there's nothing, Your Honor, to show that just because the name wasn't in the registry that the target wasn't using some sort of pseudonym, or that he didn't check into the hotel under another name, or that the name that the target had, or excuse me, that the informant had for the target was a name that Xavier Howe also went by, was an alias for Xavier Howe. So to say that because the name itself is not on the registry means that the person wasn't there and the whole TIP is reliable is not a sound basis that this court should rely upon. When we get to the other factors of the TIP, specifically as the court pointed out, the timing and the specificity of this TIP, this particular morning the people involved in this drug deal were supposed to be leaving the hotel. This particular hotel in Chesapeake. Well, we don't know. The meeting could well have taken the 2 o'clock in the morning, 3 o'clock in the morning. There's no suggestion that the meeting didn't occur. Correct. The informant mentions that the people involved would be spending the night at the hotel, and that's why the investigators get there the next morning, early the next morning, that they would be leaving that particular morning. This particular hotel, which Detective Beha testified about making numerous drug arrests and drug seizures from, he spoke to drug traffickers who stated that this was a preferred location, this was a preferred hotel in the area for this sort of narcotics trafficking activity. And then when we check, the detectives check the hotel registry, Mr. Howell's name is found, along with another individual who had involvement in drug distribution, that the detectives say, and whose name they recognize. We can't then ignore what happens after what the investigators know about Mr. Howell. It's the tip combined with their knowledge of Mr. Howell's history, which the court is well aware of. There's a 2008 conviction, not for simply possession, but for possession with intent to distribute a controlled substance. After that prior conviction, he's listed as a director in the business, whereby controlled substances are being purchased. That's about 2014, 2015. After that, a year or two after, CIs name him as someone involved in drug trafficking. And one specifically says they've seen him in possession of drugs. And then current day, back when this stop occurred, he's got an outstanding arrest warrant. This is the information that the detectives had on that morning, when they're encountering Mr. Howell. Not simply a tip, not simply a name, and that's it. This tip, with the information, the timing and specificity of that tip, as well as their knowledge of Mr. Howell's history, let alone the fact, which the court has already pointed to, there are uncanny similarities to the tip and Mr. Howell, how he appears that day. The color and the type of vehicle, the dark colored SUV, it being a rental car, short stay. Not only that the short stay was one night, it was the night about which the informant gave the information about narcotics trafficking. He's accompanied by an unknown African American female. That matched this tip. The officers didn't know. My colleague mentioned in his brief that the officers knew he had a sister. They didn't know the identity of this woman at the time that this stop occurred. Add to that the cautious driving after the fact. Now, innocent factors, the court well knows, can come together to create reasonable suspicion. That's inevitable. It's not that any of these factors alone are suspicious, and that's outside of the tip, of course, but are suspicious in and of themselves. It's that they're all taking place on the night in question, the night about which there is this tip from a reliable informant that there will be a meeting of drug traffickers, and then that combined with Mr. Howell's history of involvement. When counsel gives a description of this describes a number of innocent people, we look to the court's thinking in Proust, and we start with basically a number of innocent actors, the number of people at the hotel this particular day. That's a big pool of people. That could implicate everyone as to this tip. However, every other piece of information from this tip shrinks the pool, shrinks the pool, and it becomes more narrow. People driving rental cars, people driving rental cars with out-of-state tags, people driving a rental car that's dark in color, people with a female companion who's leaving that morning, and then by the time we get to the cautious driving, we have narrowed the pool so much. We have shrunk the pool so much. The question with the cautious driving, and I tried to figure this out in the record, is your understanding that the officers who were tailing him, who observed this cautious driving, were they in a marked or an unmarked car? Unmarked, Your Honor. You imagine maybe the reason I'd say that is like, I think a fact that we can observe about the world is that when people observe marked police cars, they often start driving very cautiously. Absolutely. Yes, Your Honor. But your idea is here, this person wouldn't necessarily have known they were being observed by the police at the time? Correct. And at this point, we are so, we have so much reasonable suspicion that this is the latest addition to that. If we were to take, basically, by the time we reach the cautious driving, there's so much other indicators, there's so many other factors pointing to, towards this vehicle and the people in it being involved in narcotics trafficking. And that this specific vehicle itself and the person in it, Mr. Howell, is the one to investigate. Such that the fact that there are other innocent actors or other innocent travelers is not as significant here as the fact that all this reasonable suspicion has now been piled on. Let me just say that you've got a lot of suspicious activity here. But once you reach the point where you're driving, if you speed, you're going to get stopped. And if you're cautiously driving, you're going to get stopped. I'm not big on the cautious driving being a factor. But you've got a lot of other stuff to work with. Understood, Your Honor. Can I ask you, did the detectives learn about the warrant before the police officer did? No. That was not an extraditable? No. Who learned first, the police officer Byrd? Yes, sir. So he did his check when he made the stop. Yes, sir. Ten minutes later, he got a response, it's not an extraditable. After he sent his response, I think, 12-11 to 12-21. Yes, Your Honor. The detectives, when did they learn? I believe the detectives were in communication with Officer Byrd. So Byrd advised them? Yes, Your Honor. And the dog alerted five minutes before he heard back? Yes, Your Honor. So your argument is that when the dog alerted, they had probable cause at that point? Yes, Your Honor. And that stop wasn't unnecessarily prolonged, it was five minutes. They were being stopped for either, you could say, the reasonable suspicion that led to the traffic stop, or you could say, the fact of the warrant itself to investigate that. That's a temporary stop to perform an investigative function. There was no unduly, there was no, I guess, no undue stop. They did exactly what one would expect them to do. They stopped the vehicle, they checked the information, it didn't take long to come back. By that time, the dog had alerted. If, as our brief says, Sorry, do you have a sense of what percentage of out-of-state warrants are non-extraditable? That's a genuine question, I don't know the answer to that. I don't either, Your Honor. I think because of just Detective Beha's testimony during the motion to suppress, that it is frequent enough that it's not extraditable, that they have to check every time, such that, You can't just assume the warrant is extraditable? Correct. He mentioned that he had seen it go both ways. You stop somebody, the warrant says it's extraditable, and it's not, when they actually call and confirm, and then the opposite way, Your Honor, that it turns out that it is. Would you agree that in general, it seems likely, though, that the more minor the offense, the more likely it is to be non-extraditable? I imagine a homicide warrant is almost always going to be extraditable. I suspect a failure to appear warrant is, on balance, less likely to be extraditable. I can't say. I guess it would depend on what the underlying offense would be for which the person was If the underlying offense is trivial, on balance, it's more likely to be non-extraditable? I think so, Your Honor, but I don't think the officers, in this case, had access to that information. And I guess to make, to make, express something that I think is implicit, if the officer knew a warrant was extraditable, non-extraditable, for example, if a police officer knew that a given warrant was non-extraditable, is it implicit in what we're saying that that would not supply probable cause to stop somebody? If you knew there was a warrant, and you knew the warrant was non-extraditable. So, of course, those aren't the facts here. No, of course not. I think that the policy, in this case, exists, and it's a national policy, because it's just a record check. The hypothetical is when the officer stops the vehicle, and he knows the warrant can't be extraditable, is not extraditable. Can he use the warrant to stop the vehicle? I don't think so, but the reason that the policy exists is because that what's written in NCIC is not always accurate or up to date. Oh, I understand. In other words, the warrant could be for murder, or the warrant could be for not, for failing to appear at a deposition. I mean, we're talking about a big range of things, but my point is, it's really just a follow-up on Judge Hyten's question. I would assume you have to concede that if the officer knew the warrant was non-extraditable, that would not form a basis for stopping the vehicle. I still think a brief investigatory stop is possible in those circumstances. To do what? To verify the information from NCIC, let's say. If we're in a world where we know... The hypothetical is the officer knows he's done the check, the warrant is no good. It's good, but it's non-extraditable, and he stops. And that limited set of facts, I think that's correct. You cannot stop. Can I go back? There's no dispute that in this case, the officer knew this was a failure to appear warrant, right? Before anything was confirmed, the initial hit told this officer this was a failure to appear warrant. They knew it wasn't a homicide. They knew it was a failure to appear warrant. They knew that this defendant was based in Georgia and that this occurred in Virginia. What occurred in Virginia? The stop itself. Coming into contact with Mr. Howell was in a different state, and then they see a failure to appear. Just one follow-up on that. They knew the failure to appear warrant was for Georgia. They knew that. Yes, I believe that's in the screenshot. The actual... Where it comes from. Would it make a difference if the failure to appear was the failure to appear for a felony trial as opposed to the failure to appear for a traffic violation? I don't think so. If we're in the world that Your Honor's created where we know it's extraditable from the second we check someone's record, if it's extraditable, then it doesn't matter that it's for failure to appear to traffic hearing. I don't know the answer to this, but I'm wondering if he fails to appear for a felony trial in Georgia and they issue a warrant for his arrest or make it even more serious. He's being convicted. He's being tried for murder, and he's on bail, and he flies a coupe, and they issue a warrant. Would that be extraditable, that warrant? I think so, Your Honor. But again, I think this case points to whether or not the stop itself... Forget this case. I'm just trying to get some ground rules here. So when they see it's failure to appear, a failure to appear warrant could be extraditable or could be non-extraditable. Correct. That's your point? Yes, Your Honor. All right. One last question about the policy. So as I understand it, in the record, we have the detective's testimony that he was prohibited from confirming the warrant status. Is that as the actual policy in the record, anyone? Yes. I believe Your Honor asked me that earlier. Right. I've asked my staff to look, and they couldn't find it. I apologize, Your Honor. As I said, the policy was attached as an exhibit at the motion to suppress hearing. The only site I have, I don't... Is 46 the right page? 47, Your Honor. 47. Yes, this is Jessipeak's policy. Is it the actual policy or is it the testimony from the officer? It's the actual policy, 46. Okay, thank you. The NCIC policy that's referenced, I don't see it attached to it. Understood. With that, Your Honor, Your Honors, I think that when we point to the tip in this case, and Your Honors mentioned it already, but it's not a coincidence. It's an uncanny coincidence. It's too uncanny to be a coincidence. It's got a couple of material flaws in it, and the question is whether it is an accurate tip based on what he learned, and something in the intervening changed the facts like somebody else was driving changed, or it's just a misinformation. It's a wrong instance altogether. It's hard to tell because, number one, we don't have the name of the person, and number two, there was also a suggestion that the vehicle was coming from the north. But it seems to me that there are hypotheticals that could still make that accurate. I mean, I would guess that if they had a meeting or if that was accurate, the meeting was probably at the night in the motel room. Drug dealing is often 2.33 in the morning, and this was a meeting of drug dealers, which was thought to be a forecast. All right, your time. We've got to let you go a little bit beyond. Let us hear from Mr. Sheldon, and before you get started, Mr. Sheldon, could I just confirm what your understanding of the timing and sequence is? I probably had a misunderstanding, but as I understand what I'm hearing now from the government is that Officer Byrd stopped the vehicle a few minutes after 12. At 12.11, Officer Byrd requested a check through the system of the warrant. At 12.16, five minutes later, the dog alerted. At 12.21, the officer learned that the warrant was non-extraditable. Is that correct? That is partially correct, Your Honor, and I think I can answer both questions about the policy, the percentage of non-extraditable with this answer. At JA-117, Officer Byrd testified that he got the warrant and he testified, and this goes to the percentage. What percentage? I would say zero are extraditable because Officer Byrd testified. Could you just answer my timing question and then we can make judgments about that? You're correct. I want a follow-up question then. If I'm correct on that and the Officer Byrd is making a stop based on a warrant and at that time he doesn't know whether it's extraditable or not, then it seems to me the problem you are facing is that the dog alert before he learns the warrant is not reason to stop. He makes a stop probably justifiable on a warrant where he doesn't know whether it's extraditable or not. The dog alerts and at that point he has probable cause, doesn't he? I disagree, Your Honor. JA-117, Officer Byrd... No, my question was if the dog alerts, does he have probable cause? Yes. Okay. That's right. If the dog alerts his probable cause, we're not arguing about that. What we're arguing is that Byrd testified that he had zero in his entire career extraditable warrants. He looks at the warrant. It's a failure to be here, out-of-state warrant and he has testified, I have never had one that's extraditable. Zero. Why did he check? We know why he checked. Your Honor, the whole reason why the whole ruse was done. Why didn't... The big question is... Police Officer Byrd is told by the officers, there's a warrant, outstanding warrant for this guy and we want you to stop him. And it seems to me that that entitles the officer to stop him, unless there's something defective about the warrant. Judge Niemeyer, I think the one thing that's obvious about this case is the entire thing was a ruse and the only question is, is the ruse affordable? So, Officer Byrd knows it's a ruse? Yes, of course he does. Why? Because Detective Beha has Howell in front of him with the bag and the car and the lady and Detective Beha has all the resources in the world to arrest Howell right then. Why doesn't he? He knows everything. He's been looking at the warrant for two hours. Why doesn't he take him right then? Why would he risk letting him drive away? Because he knows. In the officer's situation, in his position, he knows it's not enough. I'm talking about Officer Byrd. He was a police officer, wasn't he? Yes. Uniformed police officer. That's right. Alright. He's called and he says, pick him up, we have a warrant for his arrest. And he knows why. He's informed. He knows why. Where's that in the record? The testimony from Beha is that I had four or five conversations with Byrd about Howell and that I wanted him to pull him over, to track him and pull him over. What did he say? Tell him what he said that made the officer doubt that this was anything but legit. Your Honor, if this wasn't a ruse, then why didn't Detective Beha just arrest him? Look, I'm not asking for the logic. I'm asking for the evidence. The evidence is that when Detective Byrd found no traffic violations, he eventually pulled him over. He didn't ask for it. He was called to say, arrest him on a warrant. He didn't ask him to pick, he said, stop him, because we have probable cause, we have an outstanding warrant, and we have a... And as soon as Detective, as soon as Officer Byrd saw the warrant, he knew, this is from the officer's perspective, we have to look at it, he knew that he had never had an extraditable warrant in this situation before. Zero. At that point, it is unreasonable under the Fourth Amendment to continue to detain. I would just like to make sure. So I'm looking at page 117. Yeah. What I see him saying is, I've never seen a non-extraditable warrant. He actually says, basically, two things. He says, I've never seen a non-extraditable warrant. I've actually never done a full extraditable warrant, but I've seen situations where I've stopped someone who showed a warrant and they'd already been serving the warrant. I mean, he actually, in back-to-back sentences, seems to say things that directly contradict him. And so, the district court was not clearly erroneous when the district court said that he had no faith and he was skeptical of the officer's testimony. Right. In note six... Sorry. The district court said the district court had no faith and was skeptical, or the officer had no faith? The district court said he was skeptical of the testimony regarding the warrant and put no faith in that. In note six. May I ask, why does that matter under Wren? Because the district court heard the evidence, made factual findings. I mean, Wren says... I mean, whether that makes sense or not, Wren says very clearly that what's in this officer's heart does not matter. Not what's in his heart, but the district court was skeptical of the testimony of police officers and found that the whole warrant issue was a ruse. In note six. That's just too general. And those were findings. That's just too general. If you focus at Judge... Officer Byrd, he's a police officer and he makes the traffic stops. These detectives don't want to make traffic stops. They don't want to take them down like they do drug dealers. They wanted the officer to stop to determine what's in the bag. And so he tells them, we have a warrant. Stop them. And he stopped them. And I'm a little surprised at what Judge Hytens just pointed out to you that the officer said, I've never seen a nun. Although I think, in fairness, when I kept reading, I realized the court clears that up next question later. It says he's never seen an ex-provider. That's right. That's right. And the district court made factual findings and didn't rely on the warrant because he was skeptical because they had all the ability in the world to confirm it and didn't. Of course, Detective Beha never found this warrant in any other database, right? He looked in other databases, only found it in one. It was a failure... See, that's irrelevant. What's relevant is the stop and the dog search. The stop, the question is whether the automobile stop was legitimate. If it was, we have a dog sniff that creates probable cause. Well, if you're going to... It seems to me that we ought to be focusing on Byrd. If you're focusing on Byrd, he has never had an extraditable warrant. As soon as he sees it, he doesn't have reason... And the district court was not clearly erroneous in Note 6 when the district court was skeptical of the whole mess of testimony about the warrant, which is why I think we didn't discuss it when I was arguing. You know, the problem with the exclusionary rule is this. If I can just... Do I have... No, you're over time, but go ahead. You've got 30 seconds. The problem is this, right? That you only get the cases where they're arrested. If Howell had no drugs, he wouldn't be a drug dealer. This would be a coincidence, and that's the problem with the exclusionary rule. You know, it was so clear when Beha said, to be clear, the out-of-state target was not the defendant. He's not talking about confusion about names. The testimony and the argument of the government in the district court was there was no confusion. It's not Howell. Thank you so much for letting me... Okay, thank you. We'll come down and greet counsel and then proceed on to the next case.
judges: Paul V. Niemeyer, Toby J. Heytens, Max O. Cogburn Jr.